## STEWART–WARNER CORPORATION v. A C SPARK PLUG CO.

No. 445.

District Court, E. D. Michigan, Northern Division.

Dec. 11, 1933.

Wilkinson, Huxley, Byron & Knight, of Chicago, Ill., and Arthur M. Smith, of Detroit, Mich., for plaintiff.

Cooper, Kerr & Dunham, of New York City, and Bruce G. Booth, of Detroit, Mich., for defendant.

TUTTLE, District Judge.

This suit involves reissue patent No. 18,-112 to Moulet, a resident of France. On June 4, 1917, Moulet applied for, and later secured, a substantially equivalent patent in France, No. 494,871. Then on July 9, 1918, he filed a United States application, which was pending in the Patent Office until August 31, 1926, when it issued in its original form as patent number 1,597,689. This original patent was later assigned on October 11, 1927, to the plaintiff in this case, and on April 10, 1930, the application for reissue was filed, and on June 23, 1931, the reissue patent number 18,112 was issued.

The patent relates to the pumping of gasoline from the supply tank at the rear of an automobile to the engine carburetor which is under the hood at the front. This work of getting the gasoline, or gas as it is commonly referred to, from the large supply tank to the carburetor that uses it in mixing the gas with the air for the use of the engine has passed through four well-known stages:

The first stage used a gravity supply tank near the engine, either under the front seat or the cowl of the automobile and the gas flowed by gravity to the carburetor as needed. Mechanically that was a simple method, because gravity did the work and fed the gas to the carburetor. So long as the tank was kept above the carburetor, it did the work that was desired; but that was not a nice place to have ten or twenty gallons of gasoline. It was right near the occupants of the car and it was doubly objectionable because the gasoline was near the engine, the sparks, and the heat that might start a fire.

The second stage was to mount an airtight supply tank at the back of the car and use an engine driven pump to maintain a pressure of air in the tank to force the gas up to the carburetor. This, again, was not entirely satisfactory and an auxiliary hand pump was necessary to pump up pressure initially for starting. There was also a great danger of leaks and fire due to the pressure.

The third stage was, in a way, going back to the first stage: It consisted in placing a small two-chambered vacuum tank in the engine compartment under the hood and using the engine intake manifold vacuum to periodically suck air out of one chamber of the vacuum tank, so that the atmospheric air pressure on the vented rear supply tank

pushed the gas up into that first chamber of the small vacuum tank above the carburetor, and then by gravity the gas was periodically dumped into the second chamber and fed to the carburetor for its use.

While this third stage was a big improvement over what had gone before, and although it went into general use, it was far short of the fourth stage which we now have.

The fourth stage is so satisfactory in comparison with what has gone before (and the steps that may come hereafter are so hidden in the haze of the future) that every car now sold in the United States, as far as the record shows, is equipped with this fourth thing which, to us who live in this age, is very wonderful. It consists simply of a little pulsating pump which delivers the desired amount of gas from the supply tank to the carburetor just as it is needed—almost like the human heart in the circulatory system.

This fourth stage not only required a pump but it required a pump possessing special characteristics. I go now directly to what is being done by both the plaintiff and the defendant, who supply, either directly or indirectly, the demands of the whole United States. The thing that does the trick and distinguishes this fourth stage from what had previously been in use possesses these characteristics: A pump with a casing wall that is rigid and unyielding, with a circular opening in it and fastened across that circular opening several layers of airplane cloth or fabric that have been treated in a particular way so that gas or air cannot leak through: Metal discs or washers are attached to both the inside and the outside faces of this fabric at its center, leaving a flexible annular zone or ring that yields as the center discs are moved in and out in piston fashion. An actuating mechanism is attached to the discs. There is a valve controlled intake and a valve controlled outlet to this chamber casing. As the discs attached to the fabric are pulled outwardly, the chamber increases in size and sucks in gas, and as the discs and fabric are pushed in the valve that lets in the gas is closed, the size of the chamber inside is decreased, and the fluid in the chamber is forced out past the valve in the outlet opening, and so this little pulsating heart goes on being actuated by the engine, at direct camshaft speed.

It is so arranged, however, that this pushing in and pulling out is done in this way: The pull-out stroke, which means the suction stroke, the one that increases the size of the chamber, is made positively by a cam of the engine camshaft, and has a fixed outward lim-

it. It always fills the chamber to its full capacity, because in that direction the stroke is fixed, but on the stroke in the opposite direction, which means the discharge stroke, there is lost motion with respect to the cam, and that discharge stroke that I refer to is caused by a spring.

I do not need to describe the spring, because it does not matter what kind of spring it is, but it is a resilient action, while the cam action is positive; that is to say, when the cam releases the actuating member, the spring takes it up and forces it back resiliently, and inasmuch as the discharge stroke is a resilient spring action stroke, it is not a certain stroke but a stroke depending on how much fluid flows from the pump to the carburetor, the carburetor being of the usual type arranged with a float valve.

The carburetor, I find, determines for itself how much gas is needed and used by the engine; and the amount of gas discharged by the pump, by this resilient spring pressing in the discs and fabric, is determined by how much is needed by the carburetor; therefore, we have the carburetor taking only the gas it wants for the engine, whether it be idling or coasting down hill and using little gas, or fighting through mud or sand or climbing a steep hill and using its maximum requirements. The carburetor always feeds the amount of gas the engine needs as the driver of the car steps on the accelerator or releases it, and the flow of gas is regulated by the float valve of the carburetor in so far as the amount of gas that is taken from the pump is concerned, and the pump always keeps an excess supply of gas for the carburetor. If little gas is fed by the carburetor to the engine, then, of course, the resilient spring on the inward stroke of the plunger does not drive much gas out of the pump to the carburetor, and therefore the positive intake or pull-out stroke is not long and does not suck much gas into the pump. I find always the same amount of gas in the pump chamber at the end of each suction or cam stroke, which means, of course, taken with what I have said, that this intake suction stroke always brings in the same amount as has been forced out by the preceding resilient stroke for the use of the carburetor.

This is the thing that is working today in millions of cars now in use and now being made. This thing I have described is very wonderful. If a man could have gone completely from stage 3 to stage 4, he would, of course, have made a very meritorious invention, but no one person did it.

The fact that this pulsating gas supply is being used in every automobile sold in the United States, and the fact that this patent is concerned with the flow of gas from the supply tank to the carburetor, do not mean that this plaintiff is entitled to a patent covering the entire fourth stage. On the other hand, if he is not entitled to all of it that is no reason why he should not have part of it if he has done some part of it, and that part of it is big enough to justify a patent.

Patent decisions relative to the breadth to be given claims, grew out of the fact that patent cases are tried in courts of equity, and when it is found that one has revolutionized an art, the court looks at the matter through glasses which are generous, and rather magnify the virtues and diminish the defects in an effort to do justice. On the other hand, a study of patent opinions teaches that when there comes before a judge a very wonderful thing, he is not to jump to the conclusion that he necessarily has a good patent to deal with.

Some of the things which I have described as constituting the fourth stage which is now in use are not per se and by name found in the plaintiff's patent, while others came before the plaintiff's patent. The problem is to find what was ahead of the patent and then by eliminating that prior art from what was disclosed in the patent to find out what part the patent played in the development. Plaintiff has stepped into the shoes of Moulet and is entitled to all that Moulet deserved, and no more.

For this purpose, we do not need to go into details about the first three stages, nor the history of the carburetor, except to say that all three stages had the carburetor with its float valve, before going to the fourth stage, and before Moulet and his patent in suit. The carburetor was and is a little device which meters gasoline and mixes it with a comparatively large quantity of air, and does that metering by the rush of the air past a little opening or nozzle which supplies the gas, and the float valve in the carburetor regulates that little supply so that when the gas is taken out as needed the valve will open, and when it has enough the valve will close.

The float valve carburetor just referred to was old before the patent in suit and before the fourth stage began.

We also had before Moulet piston pumps with a positive suction stroke to a certain place or destination, and a resilient discharge stroke or movement the length of which would be determined by the "choking," to use the words of Moulet, of the pump, so that the length of the resilient discharge stroke was determined by the amount of gas which had been used out of the pump. The German patent to Deutz No. 237,157 shows a piston pump of the above type discharging into a Diesel engine requiring definite amounts, but amounts which vary with varying conditions of engine operation. The period of the spring actuated discharge and the extent of piston movement is varied automatically by the speed governor. The following suction stroke is positively actuated to a fixed limit, so that it takes in a quantity precisely the same as the quantity expelled by the previous resilient "choked" discharge stroke.

Then there were Lindley et al. patents— U. S. No. 440,485 and British 16057 of 1888, with the Bourdon tube—a tube flattened out and closed at one end and bent around almost in the form of a circle, and which made use of the same thought and principle as the piston pump in that if you decreased the size of the fuel chamber you discharged liquid through a valved outlet, and then if you increased the size of the fuel chamber the discharge outlet valve closed and liquid was sucked past the valve in the intake opening.

Lindley, like others before him, recognized and made use of the idea of increasing and decreasing the size of a fuel chamber, and Lindley did it by pushing against the end of the Bourdon tube in the direction which tends to straighten it out, so that the flattened sides of the Bourdon tube became farther apart, and caused a suction in the tube; then as he let the resiliency of the tube move it back more nearly to the form of a circle, the inner side closed towards the other side and expelled the liquid. This breathing or pulsating is caused by the relative movement of the two sides. When they are close together the content of the chamber is smaller; when they are apart the content is greater, and by pushing against the free end of the tube and withdrawing, letting the tube come back more nearly to a circle, there went on this breathing of the sides of the Bourdon tube, sucking in and pushing out the fuel to supply the engine.

Lindley had that idea that I have described, and though his use delivered a fixed quantity of fuel on each breath, it only delivered such fixed quantity when the engine speed governor determined that it was needed. That is what he wanted, but this tube which has a positive suction stroke in one direction and a resilient discharge stroke in the other direction is capable of and adapted to produce variable strokes in accordance with

varying engine needs. In the environment in which Lindley placed the Bourdon tube pump, he did not require a supply different on one discharge stroke from what he needed on another, and it met his needs, which were a fixed quantity of fuel when a discharge stroke was called for. It was said that there was no lost motion in Lindley; there would not need to be for the purpose for which he used it, but one only needed to put the little lever that pressed against the end of the Bourdon tube at a distance from the Bourdon tube to get that lost motion, and Lindley shows it in that position; therefore, his pump structurally unchanged is equally well adapted to an environment where variable pump strokes are required as a result of varying engine needs.

Then, passing over much that is in the prior art, all that I will say now is that Moulet used what was old in the art, so far as there is any thought in his use of a fuel chamber with inlet and outlet valves, and with provision to decrease the size of the chamber to expel fuel and to increase the size of the chamber to admit fuel, whether the changes in capacity are made by a reciprocating piston or by pressure and relaxation of a Bourdon tube as in the Lindley pump.

Both Lindley with his Bourdon tube, and Moulet with the accordion bellows, avoid the need of piston packing. Perhaps both may be regarded as having an improvement in this respect over a piston type of pump. In comparing Moulet with Lindley, it may be said that Moulet took the inner wall of the Bourdon tube and arranged it with bellows folds so that it could be compressed and expanded because of the folds, instead of bending it as a whole, as did Lindley, in the process of enlarging and decreasing the pump chamber capacity.

That was an improvement over Lindley. It is a different way, it would fit a new need, it was a change, but there is a marked similarity between the bellows of Moulet and the Bourdon tube. You can take one end of the Bourdon tube in one hand and the other in the other hand and straighten it out and shut it up. Here we find Moulet taking that inner member of the tube and folding it on itself and leaving the other rigid, then collapsing or pulling out the folded part to make the chamber smaller or larger.

I do not belittle the step Moulet made, but he is not entitled to the idea of discharging, even resiliently, from a chamber by making it smaller or sucking into that chamber, even positively, by making it larger, or by doing

that by pressure on the outside of an enclosed chamber which has no machinery or parts moving in it, because that is exactly what the Bourdon tube construction as used by Lindley did; nor did Moulet do the trick that we are enjoying to-day in the automobile art. The thing that Moulet performed was an improvement on the Bourdon tube and was an improvement on the prior art. I am speaking now about his pump and not about its combination with a carburetor. The engine suitable for an automobile is much like the engine suitable for an airplane. Yet the demands for gas by an automobile were quite different from those for an airplane. Even if Moulet did a good job of making a pump for an airplane, it was not the kind of a pump which would meet the automobile needs of to-day.

I am not talking about how much you would have to modify Moulet's pump or about substitutions, but I am taking Moulet's pump as he made it. This record is very unsatisfactory so far as telling this court how well the Moulet pump worked on airplanes, but I reach the conclusion, after giving everybody what I think they ought to have, that his pump worked satisfactorily for a short time. It worked for short periods of time on airplanes as used in the war, but that is not the use required in a mail plane flying from New York to California twice a week or from Detroit to New York every day. The planes used in the war could be overhauled frequently and were serviceable so long as they would give a few hours of flight. The Moulet type pumps were abandoned many years ago even for airplane use in this country.

Moulet made his application for his French patent just about the time we got into the war. He did a great service when he invented a pump which even for a few hours gave the airplane a better supply of gas than any prior pump. He could put a new one on and if it would run fifty hours that was all right for an airplane in war service. He could have, as he did, an emergency gravity tank to get back home if something did happen, whether by bullet or any other way.

But as you come over into the automobile art, a pump must last two or three years, running at high speeds. You cannot be putting a pump in your automobile every little while; you must have a pump in your automobile that will run from New York to San Francisco over the mountains and back again. In that respect the needs were quite different, and I think the real explanation as to why the fourth stage did not supplant the third

stage at an earlier date was because the essential characteristics of the pump which made the fourth stage a success had not been discovered. It is an unusual situation to have one product entirely supplant another and go so quickly into universal use.

Here was Moulet filing his application for patent in France on June 4, 1917, and using the invention to a substantial extent over there, and the world knew about it then. I give the plaintiff full credit for that. I think we can say with reasonable safety that Moulet's pump was used on airplanes in France in 1917, and later a similar type pump was used on airplanes in this country; later still another similar type pump was tried out on automobiles, and while this type of pump looked pretty good, yet it would not do the trick because of that continual bending of the metal. It just looks reasonable that it would not have endurance. Even running at greatly reduced engine speed it would stand up for a time sufficiently long to go over the enemy line and get home, but it could not be used to-day and tomorrow and for the next two years without giving trouble. In the automobile field there must be long, lasting, good service and not simply good service for a few hours. The Moulet pump did not possess that quality of durability. It was not the kind of a pump that could supplant the vacuum tank. If no one had thought to use the specially treated fabric, we would still have the vacuum tank.

The fact that the Moulet pump was developed, patented and known to the public, including the defendant, before the pump now in general use was developed does not necessarily mean that this fabric pump is in the nature of an improvement on Moulet. The pump now in use did not grow from the Moulet branch of the art.

The one who invented the pump now in use may have known of the Moulet pump. It does not matter if he did. He designed something different from Moulet. He designed a pump having a circular fabric secured at its periphery to a rigid casing, and with discs and a stem fastened at its center to permit the annular fabric part between the discs and the casing to act like a hinge. This fabric does not yield throughout its area as does the metal wall of the Bourdon tube, nor does it have the collapsible expanding and contracting movement as in Moulet. I am not talking about whether the inventor of the present pump is entitled to a patent. I am saying that it is not an improvement on Moulet, but that it is a separate invention in the art; it is a little

nub sticking out all of its own in this old art; and finally, with the old things that were available, it did the trick.

One thing about which I feel very sure is that this art would never have been revolutionized, and we would never have gone to the fourth state in this branch of the automobile art except that to what was known was added this specially treated fabric, used in this peculiar way. If one were forced to do without the fabric for this vibrating, pulsating membrane which enlarges and decreases the size of the fuel chamber, and were forced to take and arrange metal means for enlarging and decreasing the size of the chamber by changing the shape of the metal, it would probably be done by something more like Lindley's Bourdon tube than like Moulet's bellows. In other words, if accomplished by metal, it would have been a metal means that breathed back and forth by making the sides move close to one another, and then separate from one another by vibrating throughout its length, rather than by using a larger, more spacious chamber formed by a metal bellows, and collapsing it upon itself by bending the metal at each fold, because, like a weak link in a chain, the weakest fold would give way and spoil the whole pump. Durability is one of the things we must have, so I feel very strongly that you might better start from the flat resilient Bourdon tube if you are going to use metal at all than to start from a corrugated bellows like Moulet, which collapses the chamber by bending of the metal upon itself at each corrugation, depending upon its toughness for a hinge.

The present fuel pump has a reciprocating part or plunger more nearly like a piston. I do not think the circular fabric with the discs can be called a piston in the strict sense of the word. It does not conform to the definition of a piston. But in a court of equity, when we consider that this last trick of using fabric is the one that makes possible this wonderful pump that we all enjoy, we ought to consider how much it is like a piston. We have a rigid casing with one round opening covered by fabric, which at its center point is pushed in and pulled out by reinforcing washers or discs that cover the greater part of the fabric, and which assembly moves in to almost completely fill the chamber. You have without doubt the same effect as a piston or plunger, with a flexible ring or skirt around the center or plunger part to form the equivalent of a packing.

In other words, a fabric skirt is a way we know of letting things yield. I know I have

seen a lot of things done that way in the world that I cannot recall at present. I think of the heavy metal vestibule frames on Pullman cars, with the folded canvas seal to permit movement, and the old household insect powder spray can with its fabric top with a center metal disc to be pushed down against an inside spring. It is not a far step to think of that as a piston which, instead of having a packing, has a fabric stretched from the rigid center portion across to the casing or cylinder, so that although it is not a true piston, it is the thing that meets the requirements of the automobile pump as to durability and sealing, and gets away from the necessity of bending metal.

What Moulet really had in mind as to what he was inventing, whether he had ever seen a Bourdon tube or not, was to increase and decrease the capacity of a sealed metallic chamber in a fuel pump; and instead of doing it by vibrating the tube from end to end he would collapse it.

He uses some language in his reissued patent claims that possibly might apply even to cloth; and though I do not think he is bound by all that was said in the Court of Appeals of the District of Columbia (Giesler v. Moulet, 56 App. D. C. 196, 11 F.(2d) 911), I see that what he was fighting about and contending for in that court, and what the people representing him believed to be his invention, was the use in a fuel pump of a sealed metallic collapsible envelope, and that it must be resilient.

It was argued that one could not make his collapsible vessel out of cloth, but that it had to be metal that would bend upon itself, back and forth. That is what the record shows he thought he had invented, and for short hours of service in war-time it evidently was a good thing.

Moulet did not invent the creating of suction by positively enlarging a chamber and the reverse idea of expulsion from it by compressing it; and eliminating from Moulet's pump all the things either well known in the art or shown in prior patents. I think Moulet is properly limited to the use of a collapsible, resilient metallic envelope in a pump. This is what he had in mind, and what one reading his patent would think he had in mind. You may read his patent, you may look at his drawing, and you feel that he thought he had made an invention in using the collapsible metal bellows. I think he had accomplished something, performed a useful service with it, but the record shows it was not used and was not practical in the automobile art even

though the engines are almost interchangeable from automobile to airplanes. The work of a man who will take one of the old rigid pump chambers and put into it the fabric diaphragm must not be measured as an invention on Moulet, but instead as a separate invention. The use of the special fabric stands out in my mind so far as the pump alone is concerned. (I am not talking about any connection with the carburetor.) I am talking about the pump per se, the way it works, the way it is built, and the things it will do. I think that what the defendant does, and the entire public is using, is not developed from Moulet but is an invention that should ride along beside and be a separate nub on the patent art. I am not able to see the two hinged together. Loew Supply & Manufacturing Co. v. Fred Miller Brewing Co. (C. C. A.) 138 F. 886; Adams Electric R. Co. v. Lindell R. Co., 77 F. 432, 23 C. C. A. 223 (quoting from Chicago & N. W. Railway Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053).

If somebody invented and held a patent on the idea that every time you decreased the size of a chamber you expelled liquid, and when you increased you sucked in liquid, then I would say both Moulet and defendant ought to pay royalty to that man; but, of course, that idea is as old as the hills.

Moulet wished to move the pump chamber walls for the purpose of varying the size of the chamber and he did it one way, while defendants are doing it another way. If you say defendant is making the chamber smaller and larger, sucking in and expelling, the answer is—not in the way Lindley did it nor in the way Moulet did it.

It looks as if the defendant, under the teachings of the Carter U. S. patent No. 1,695,534, was the one who created the pump in controversy, but that is not for me to determine in this lawsuit. My problem is to bear in mind the history of the art and the Moulet patent, and to determine how broadly or narrowly its claims are to be construed.

Here is a patent applied for in France on June 4, 1917, for a thing that was commercially used on airplanes; applied for in this country in the summer of 1918 and granted August 21, 1926. No one used it in the automobile art at all. It slumbered from then on until April 10, 1930, when there was an application for a reissue, finally granted on June 23, 1931. In the meantime, beginning in 1927, or three years before the reissue application was filed, these very defendants and the entire industry began to use the thing that has done the trick, so that defendants

and all automobile manufacturers as well as other engine makers and users, and all persons that purchased automobiles, went ahead and universally adopted this new thing that did the trick. With the above history, the patent in suit must be closely scrutinized.

The defendant began to develop the pump in suit in 1925, and subsequently marketed it to the exclusion of the vacuum tanks used in the third stage; and then even the plaintiff followed in 1928, using this same fabric disc that has done the trick, and not using the structure of the patent in suit. Now when practically the whole world is riding with that sort of pump, surely this wonderful development of the art that has occurred ought not under those circumstances to be given to these plaintiffs. That would not be right and it would not be equity.

█ The rule of law relative to patents and reissue patents, except in special cases, is such that after two years from the date of the original patent, all that was not claimed in the original patent is given to the public, and the applicant may not ask for a claim broader than the broadest claim of the original patent. He may correct claims of the original patent that might otherwise be invalid due to their being too broad, by making them narrower or more limited in the reissue patent; but here, again, as to the glasses the court uses, a court of equity ought to have in mind the commercial situation and history. The law is that a patentee, after two years, may ask for a reissue patent and get any claim less than those asked for in the original patent; he cannot get a broader claim, and he cannot get a claim on what was not originally shown. Mahn v. Harwood et al., 112 U. S. 354, 5 S. Ct. 174, 6 S. Ct. 451, 28 L. Ed. 665; Miller v. Bridgeport Brass Co., 104 U. S. 350, 26 L. Ed. 783; White et al. v. Dunbar et al., 119 U. S. 47, 7 S. Ct. 72, 30 L. Ed. 303.

Now again, though it is not covered by proof, I feel satisfied from little things that I see in the present device, and from the history that we have unfolded in this court, that undoubtedly the people that developed this fine thing we have to-day had seen the Moulet pump or pumps of that type, but I do not think they got anything from Moulet that was not in the art prior to him, and it is even plainer that whoever drafted the claims of the reissued patent which is now in suit saw this fine thing which has been developed by the defendant and which we are all using.

So here we have a case of this old patent issued in France in 1919, issued in this country in 1926, never used on automobiles, and

with claims admittedly void because they were so broad, or admittedly so narrow that they did not read at all on what we are all using now, and what the defendant is doing.

I recognize the law that I have already tried to point out, and yet in a reissue patent as close to the line as this is the court is entitled to use some straws to see what it means. When Moulet went into details in his original patent, he did not refer to the things which are now claimed and the details which would reach the thing now done, but rather he talked about things which come very far from making the defendant here an infringer.

The court must go back to the original claims and gather their true intent and meaning. After defendant had developed this very practical and useful pump, the plaintiff drafted new claims for the reissue patent which fitted exactly the defendant's pump and found only remote and flimsy suggestions for their support in the original patent. The court must not permit such conduct to result in profit to plaintiff. White v. Dunbar, supra; Carley v. Matthes, 56 App. D. C. 20, 6 F. (2d) 718.

This plaintiff should not be treated any differently than Moulet would be if he were right here in person. I have not any notion that there is anything in the law that causes that to be done. Plaintiff bought the patent, paid a substantial sum for it, and is entitled to all that Moulet would be entitled to. I do think that we should bear in mind that plaintiff bought the patent after defendant had developed this pump, which is so worthwhile, and which is the only thing that ever caused a change from the third stage to the fourth. This patent was bought and very drastic efforts made to change it into something which would fit the defendant's device, and every motive to do that, of course, was present. There was the plaintiff who during the third stage had developed a marvelous business in the vacuum tank, and controlled it in such a way that it monopolized that device almost completely, if not altogether. Then along came defendant with this new pump development, which started its production curve upward for the fourth stage. No automobile needed both the vacuum tank and this pump; therefore, the production curve on vacuum tanks started down. Just as fast as one curve went up the other went down; they were reciprocating curves. The plaintiff saw that. We need that picture to understand and appreciate the form in which these claims of the reissued patent were drawn. Some of them read in a manner to indicate that the drafter

was thinking more about what the defendant was doing than he was about what Moulet originally claimed or what he had shown or suggested. The Moulet patent in suit, interpreted in the light of the art, the light of that history, and the way it ought to be interpreted, does not reach defendant's pump. Counsel have not gone over the Moulet reissue patent claims one by one, and in our desire—on the litigant's part and on my part—to do justice to the merits of the case, we have been dealing with bigger and broader things than the exact words of a particular claim.

During the prosecution of the original patent in the Patent Office and the Court of Appeals of the District of Columbia, Moulet was asking for and representing his invention to be for a pump with an elastic inner metallic envelope, and to overcome prior art cited against him his attorney argued that such an elastic metallic envelope is essential in a gasoline pump. I do not intend to hold any claim void and invalid that is so limited. I think he is entitled to that, and I think he performed a real service with his pump, but I do not find anything in the original patent as filed that would justify claims on pushing in and pulling out fabric in the manner done in the pump in suit, and any claim that is so worded that it can be construed to cover such a construction I hold to be void. Those claims, such as 1, 2 and 3, which are clearly limited to the collapsible and extensible metallic envelope—this metal bellows—are not sued upon and quite evidently are not infringed.

Thus far I have not said anything about combination claims. There was not a claim in the original patent for a combination. Those claims are not worded in the kind of language I look for in a combination claim— I refer to a claim for a combination that includes a carburetor.

We very seldom find any claim in a patent suit that is not for a combination of elements, but what I mean is that I do not think there is any ground for a combination claim including a pump and a carburetor in the first patent. When I first looked at the patent, it did not look like such a combination patent. For example, it is not a combination drawing; there is no carburetor or tank or engine shown, and the whole disclosure and specification go to show that Moulet thought he was inventing a pump, even though he mentioned that it is particularly to go on airplanes, and also mentions that it is to be used with carburetors. He does not even bother to tell us what kind of carburetor. In fact, Moulet intended, as the evidence shows, to use his pump

in its characteristic way with carburetors of other kinds than those having a float valve. It was also customary at that date to drive airplane gasoline pumps by wind-driven propellers independently of the engines and at a distance from them. I will readily agree that it is proper to refer in general ways to the use to be made of the pump, but if you want to get the float valve of a carburetor into a combination and get a patent on the combination of a float valve carburetor, or the carburetor with a float valve in it and a particular pump and the action of that pump, the public should be advised, and it should be explained. Moulet did not do that in his first patent as originally filed.

There are really three thoughts running through this suit as I see it, as presented now to the Court by counsel: One is this relation between a carburetor with its float valve, and this particular kind of a pump in suit. The second thought concerns the structure and use of the metal bellows in a fuel pump; and the third thought—the location of the operating mechanism outside the fuel chamber of the pump.

In considering the first thought I may say that the float valve shuts off and lets in the supply of fuel from the pump. The resilient stroke of the pump is arranged so that it meets the need of the float valve of the carburetor, and the float valve does regulate the length of pump stroke and the amount of fuel delivered by the pump to the carburetor. I see that relation and that co-operation, and the first one who did that may have had room for getting a patent. Moulet, however, could not have gotten a patent if he had asked for it on that ground, because we have Hansen-Ellehammer British patent No. 23474 of 1912 supplying a float valve carburetor, with the length of the resilient discharge stroke of his pump regulated as much by the float valve of his carburetor as would be the case had the Moulet patent shown a float valve carburetor. I recognize a difference on the intake stroke because in Moulet that is a positive stroke, the same as it had been in other pumps ahead of Moulet, while in Hansen-Ellehammer it was a resilient intake stroke as well as a resilient discharge stroke; but as to the co-operation of that discharge stroke of Hansen-Ellehammer's pump with its float controlled carburetor and the co-operation of the discharge stroke of Moulet's pump with its carburetor, I discover (on that discharge stroke) the same mechanical principles of co-operation in one that there is in the other.

We had the old positive intake and resili-

ent discharge before Moulet; we had Hansen-Ellehammer with its resilient intake and a variable resilient discharge stroke used in connection with a float valve carburetor; so even if Moulet had shown and described and asked for the combination, it could not be said to be invention over the prior art. I think the co-operation is too theoretical to say that it would have been invention to take an old pump with its resilient discharge and its positive intake and put it in the place of Hansen-Ellehammer's pump, even though it did work better. Hansen-Ellehammer had discovered the co-operation between the pump and a float valve carburetor, and as far as the discharge stroke is concerned, it is identical with Moulet. Therefore, I do not think it was open for Moulet to claim that combination in the first place, and while the intake stroke of the Hansen-Ellehammer pump was resilient and not positive, there were other pumps lying around in the art that did have the positive intake with the resilient discharge, like the Lemp, Deutz, Szanto, and Lindley pumps. In the next place, he did not claim it in his application as originally filed; and in the third place, even when he did claim it as a result of the interference with Giesler, whose claims he adopted, the Patent Office criticized him because he was not justified in asking for it (I think the Patent Office was right about it), and he yielded to that criticism and took it out. I do not think it would be right to say Moulet had, or properly could have had a patent on any combination between pump and carburetor. Grand Rapids Showcase Co. v. Baker et al. (C. C. A.) 216 F. 341; Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U. S. 38, 14 S. Ct. 28, 37 L. Ed. 989; Dobson v. Lees, 137 U. S. 258, 265, 11 S. Ct. 71, 34 L. Ed. 652.

As to the second thought relating to the pump having a resilient discharge and a positive intake, I have explained that I believe Moulet is only entitled to protection on a pump having this feature in connection with a rigid chamber associated with a collapsible and expansible metallic bellows, which construction is not used by defendant.

As to the third thought relating to the location of the actuating mechanism outside the pump chamber, I have explained that this feature is old in the art, as shown in the Lindley patent.

So I say my conclusion is that there is no combination with a carburetor involved here at all. That is not in the Moulet patent and never was intended to be there. When he asked for his original patent the Patent Office did not intend to allow him a combination claim. He did not ask for combination claims in his original application—they got in there in a peculiar way—and as soon as the Patent Office discovered that he had not furnished the ground work to support those combination claims they called it to his attention and he yielded and took them out.

So the original patent was issued without combination claims, surely for the reasons, first, that he could not have gotten combination claims if he had originally asked for them, second, for the reason that he did not originally ask for them, and third, for the reason that he consented to take them out when they had been inadvertently brought in by the interference. Therefore, the reissue application had no parent case to support combination claims at all.

I therefore hold claims 4, 5, 6, 7, 8, 9, 10 and 11 of the Moulet reissue patent in suit No. 18,112, which refer to a combination or fuel feeding system, to be invalid; first, because the subject-matter of said claims is old and was shown in patents, such as Lindley British No. 16,057 of 1888 and Hansen-Ellehammer British No. 23,474 of 1912, more than two years prior to the date of the original Moulet patent application in this country; second, because the showing or specification of the original Moulet patent has no basis for claiming a pump and float-valved carburetor combination or a fuel feeding system; third, because said claims are for an invention different from the claims of the original patent, and were not applied for until more than two years after the date of the original patent; and, fourth, because all such combination claims fail to include the elastic metallic bellows to which the Moulet pump is limited.

Then, as to the pump itself, I say that Moulet's invention had only to do with the use of a collapsible and expansible metallic bellows in a fuel pump per se, as defined by claims 1, 2 and 3, and no structure in accordance with claims so limited has been made, used and/or sold, or caused to be made, used and/or sold by the defendant, and as exemplified by plaintiff's exhibits Nos. 44, 45, 46, 47, 49, 50, 51, 52 and 53.

I hold claims 12, 13, 14, 15 and 16 of the Moulet reissue patent in suit No. 18,112 which refer to a diaphragm fuel pump invalid because not supported by the original patent and also in view of the prior art, and because they fail to recite the collapsible, elastic, metallic bellows, which was the only contribution made by Moulet to the fuel pump art.

The result is a decree in favor of the defendant, dismissing the bill with costs to be taxed.

 Upon authority of Briggs v. United States (C. C. A. 6) 45 F.(2d) 479; Lewys v. O'Neill et al. (D. C.) 49 F.(2d) 603; Hazeltine Corp. v. Radio Corp. (D. C.) 52 F.(2d) 504, my opinion may stand as the findings of fact and conclusions of law under Equity Rule 70½ of the Supreme Court (28 USCA § 723).