**HICKORY SPRINGS MANUFACTUR-
ING COMPANY, Plaintiff-Appellant,**

v.

**FREDMAN BROTHERS FURNITURE
COMPANY, INC., and Harry Fred-
man, Defendants-Appellees.**

**HICKORY SPRINGS MANUFACTUR-
ING COMPANY, Plaintiff-Cross-
Appellee,**

v.

**Harry FREDMAN, Defendant-
Cross-Appellant.**

Nos. 73–1170, 73–1171.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 8, 1974.

Decided Jan. 14, 1975.

Rehearing and Rehearing En Banc
Denied March 5, 1975.

Ronald B. Schertz and Tim Swain, II, Peoria, Ill., Dalbert U. Shefte, Charlotte, N. C., for Hickory Springs Mfg.

Lyle W. Allen, Peoria, Ill., Harvey B. Jacobson, Jr., Washington, D. C., for Fredman Brothers Furniture Co.

Before CASTLE, Senior Circuit Judge, PELL, Circuit Judge, and GRANT, Senior District Judge.[*]

PELL, Circuit Judge.

In May 1970, Hickory Springs Manufacturing Company (Hickory Springs), a manufacturer of furniture hardware, introduced to its customers a metal bed device called the "Hi-Co Slatless" rails. The next month, Harry Fredman of Fredman Brothers Furniture Company, Inc., wrote Hickory Springs and one of its customers warning them that the Hi-Co Slatless bed rails infringed Fredman's Patent No. 3,118,151.[1] Hickory Springs thereupon filed the present declaratory judgment action,[2] seeking a declaration of the invalidity of Fredman's patent or, if it was found valid, of its noninfringement by the Hi-Co Slatless rails. Plaintiff also alleged a cause of action for unfair competition. Harry Fredman and his company (hereinafter referred to col-

---

[*] Senior Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

[1.] For an explanation of the problems manufacturers encountered in producing slatless bed rails and the background of the Fredman patent, see Fredman v. Harris-Hub Co., 442 F.2d 210 (7th Cir. 1971).

[2.] 28 U.S.C. §§ 1338(a) and 2201.

lectively as "Fredman") answered and counterclaimed for infringement.

While the cause was before the district court,[3] this court issued its opinion in Fredman v. Harris-Hub Co., Inc., 7 Cir., 442 F.2d 210 (1971). This court there construed claim 3 of Fredman Patent No. 3,118,151 "as an anti-spread device contemplating a slatless assembly for beds with end board notch separations equal to the width of the springs." We upheld the district court's finding of invalidity, noting that prior art had anticipated the device described in claim 3. 442 F.2d at 214–215. The *Harris-Hub* panel also affirmed the district court's conclusion that defendant's accused device was not the "equivalent" of the innovation revealed in claim 4[4] of the Fredman patent and, hence, did not infringe that claim. The Harris-Hub accused device merely "interconnect[ed] the centers of two conventional metal side rails with a strap that applies sufficient tension to bow the rails inwardly against the bedding." 442 F.2d at 213. In contrast, the "substance of [Fredman's] invention [in claim 4] includes an original design for side rails." *Id.* at 216.

> "[Their] horizontal flange[s] [flare] into the vertical at [their] ends . . [Fredman's] contribution to the art was predicated on an assumption that the portion of the rail which provides both clamping pressure from the vertical flange and adequate support from the horizontal flange 'will not flex.' . . . The benefits of parallelism are described in the specifications and,

in large part, constitute the objective achieved by the special design of the rails. . . ." *Id.* at 215.

Relying on our *Harris-Hub* decision, Hickory Springs moved for summary judgment on the issues of the invalidity of claim 3 of the Fredman patent and the noninfringement of claim 4. The district court granted summary judgment on the claim 3 point only. 330 F.Supp. 978, 981 (S.D.Ill.1971); see Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

Meanwhile, in an effort to rectify *Harris-Hub's* "emasculation" of their patent, Fredman had sought and obtained a reissuance of the original patent. Fredman U.S. Reissue Patent No. Re. 27,182. After the pleadings were appropriately amended, Hickory Springs moved for summary judgment, asserting the invalidity of reissue claims 3, 4, 6, 7 and 8 and of original patent claim 4. The district court granted the motion as to all the claims except original and reissue claims 4. (The two were substantially the same. See 338 F.Supp. 636 (S.D.Ill. 1972).

During the course of the trial, the court ruled that claim 4 was valid as a matter of law. Therefore, the primary issue left for the jury was whether the accused Hi-Co Slatless bed rails infringed claim 4 of the Fredman patent. The jury found infringement and awarded damages in an amount equal to 2% of the dollar sales of the infringement device. Accordingly, the court entered judgment for $17,983.17 and permanent-

---

**3.** Upon motion of Hickory Springs, the district court had enjoined Fredman from threatening suit against plaintiff's customers during the pendency of the litigation.

**4.** Claim 4 of the original Fredman patent read:

"The structure as defined in claim 3 wherein each end portion of each rail is formed in the configuration of a vertical plate capable of being resiliently laterally deflected, hook members on the ends of each rail for engagement with the end boards, said plates enabling the end portions of the rails

to be deflected laterally to engage with pins on the end boards spaced at varying distances apart for connecting the rails to the end boards while maintaining the central portions thereof in constant spatial relation, the spatial relation between the vertical flanges of the side rails being such that the spring assembly will be clamped therebetween whereby this spring assembly is locked to the rails to rigidify the entire assembly by retaining the vertical flanges snugly to the spring assembly throughout the major portion of the length of the rails."

ly enjoined Hickory Springs from infringing claim 4. Hickory Springs moved unsuccessfully for a judgment n. o. v. or, in the alternative, for a new trial. It appeals that denial. Fredman cross-appeals the court's decision as to the invalidity of the reissue claims.

I

Hickory Springs proffers two arguments: (1) because the evidence did not warrant a finding of infringement, the district court erred in denying plaintiff's post-trial motion for judgment n. o. v., or, alternatively, (2) because of "the prejudicial exclusion of evidence and the prejudicial and improper instructions to the jury, as well as the improper granting of summary judgment of validity," the cause should be remanded for a new trial.

A

■ The determination of infringement is normally considered a question of fact. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 609–611, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co., 194 F.2d 945, 947 (7th Cir. 1952). Further, if a jury has made the crucial findings,

"a motion for . . . judgment n. o. v. is properly denied where the evidence is such that reasonable men in a fair and impartial exercise of their judgment may draw different conclusions therefrom. . . . Thus, the propriety of such denials turns on the determination of whether under the facts, as disclosed by the record, there was sufficient evidence to warrant the submission of the case to the trier of fact. . . . In making this determination, we are obliged to view all the evidence, together with all reasonable inferences to be drawn therefrom,

in the light most favorable to [the party prevailing below.]" Hannigan v. Sears, Roebuck & Co., 410 F.2d 285, 287–288 (7th Cir.), cert. denied, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969).

See also Valdes v. Karoll's, Inc., 277 F.2d 637, 638 (7th Cir. 1960); Lambie v. Tibbits, 267 F.2d 902, 903 (7th Cir. 1959). Cf. Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc., 468 F.2d 225, 227–228 (7th Cir. 1972), cert. denied, 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685 (1973).

Recognizing the limited standard of review usually applicable to findings of infringement and the heavy burden an appellant must carry to overturn a jury's determination, Hickory Springs claims that it comes within an exception to these rules. It relies on cases such as Sterner Lighting, Inc. v. Allied Elec. Supply, Inc., 431 F.2d 539, 543 (5th Cir. 1970), cert. denied, 401 U.S. 909, 91 S.Ct. 869, 27 L.Ed.2d 807 (1971), and Foster Cathead Co. v. Hasha, 382 F.2d 761, 766 (5th Cir. 1967), cert. denied, 390 U.S. 906, 86 S.Ct. 819, 19 L.Ed.2d 872 (1968), which hold that an appellate court may consider infringement directly where the finding hinges on the construction of the patent (a question of law) or where the evidence at trial consisted of exhibits, documents, and uncontradicted testimony.

We are unpersuaded that we should exercise an enlarged scope of review here. The parties at trial did disagree with each other in regard to two basic matters at least: whether the end portions of the Hi-Co Slatless rails embody the end plate deflection required by claim 4; and whether the major angle iron portions of the accused rails bow as conventional rails do or whether they may more accurately be described as achieving a high degree of parallelism.[5]

---

5. The district court correctly interpreted our *Harris-Hub* decision:

"The Seventh Circuit decision in *Harris-Hub* cannot be interpreted as standing for the proposition that all slatless bed rails

which bow slightly along their entire length do not infringe claim 4 as a matter of law.

"It should be pointed out that this court does not view claim 4 of the patent as

To differentiate among the exhibited bed rails on the bases of their varied propensities for bowing along their lengths and for deflecting laterally in their end pieces is not the simple task that Hickory Springs implies it is. The characteristics are relative, not absolute. The witnesses at trial and the parties on appeal offered differing opinions as to the import of the construction of the Hi-Co Slatless, whether it embodies the features claimed in Fredman's patent. For example, Hickory Springs minimized the engineering differences between the end portion of a conventional rail and that of the accused rail, whereas Fredman considered those variations to be significant indicia of the supposedly different functions each type of rail performs.[6] We also note that at oral argument before this court, the parties could not agree whether a key bed assembly exhibit shown to us had been set up in such a way as to disclose its true nature.

■ In sum, we find this to be an inappropriate case for an appellate court to substitute its findings for those of the jury. *Cf.* Reese v. Elkhart Welding & Boiler Works, Inc., 447 F.2d 517 (7th Cir. 1971); Kennatrack Corp. v. Stanley Works, 314 F.2d 164 (7th Cir. 1963). Contrast Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227 (7th Cir. 1969), cert. denied, 397 U.S. 1037, 90 S.Ct. 1354, 25 L.Ed.2d 648 (1970). We cannot say

that the jury was unreasonable in concluding as it did in light of the evidence presented to it.[7]

We therefore turn to Hickory Springs' second argument, namely, that trial errors in effect ensured that the jury would find infringement.

### B

The task of conducting an error-free jury trial in a patent case is not an easy one. *Panther Pumps, supra.* The highly technical and frequently obscure words utilized in connection with a patent and the devices supposedly embodying its claims combined with the language of patent law, itself often precisely cognizable only to those in this specialized profession, pose a challenging and difficult feat for the trial judge who must guide the presentation of the law and evidence in such a manner that a jury of lay persons hopefully will render a fair and just verdict. The present case was no exception to the foregoing observations although it involved a part of a piece of furniture with which all of the jurors certainly must have been familiar.

Hickory Springs contends that the district court judge committed serious, prejudicial error in his trial rulings.

■ First, as to the limitation of the evidence that Hickory Springs wishes to introduce, we are unconvinced that the trial court committed reversible error.

---

claiming that the rail design will achieve absolute parallelism without any bowing or flexing of the right-angled portion of the rail at all. The achievement of a high degree of parallelism is the result of the special design." 330 F.Supp. at 982–983.

6. In their brief, Fredman drily comments that "it is interesting to note that Hickory Springs has not elected" to alter its conventional bed rail so as to gain the benefit of the lower costs that a Hi-Co Slatless kind of end rail entails. (On this point, see Judge Morgan's discussion at 330 F.Supp. 984.)

7. Hickory Springs complains that throughout the trial Fredman attempted to equate the Hi-Co Slatless rails with Fredman's commercial device, the Glideaway rail, which Fredman insists embodies the teaching of claim 4. Defendant's witnesses did dwell at length on the supposed similarities between the accused rails and the Glideaway. It is well estab-

lished that a comparison of a patentee's commercial device with an accused infringing device, although not irrelevant to nor improper evidence in an infringement case, is not the appropriate test for determining infringement. See, e. g., Norvell v. McGraw-Edison Co., 316 F.Supp. 198, 207 (E.D.Wis.1970).

However, at least one Fredman witness did explain the Hi-Co Slatless in terms of the provisions of claim 4. Hickory Springs at trial had the opportunity to discredit the witness's analysis and conclusions. And the district judge clearly informed the jury that "It is important for you to realize that the question of infringement is not decided by comparing the patent owner's commercial structure with the accused device. Rather the test of infringement depends upon patent protections granted to the inventor by the claims of his patent, Claim 4 here." Later in his instructions, the judge reiterated this important point.

**60**

See Rule 61, Fed.R.Civ.P.[8] Most of the material that plaintiff sought to introduce falls into one of two categories: (a) matters arguably relevant to a determination of the scope of claim 4; (b) evidence of commercial bed rails other than the accused device and of prior art. In regard to category (a), the court, and not the jury, had the responsibility of determining the scope of claim 4. The parties informed the court of their respective views on that subject, and the court, in its instructions, related its conclusions. This was the proper course. Whether the court's instructions were erroneous is of course a different question. In regard to category (b), Hickory Springs was in fact permitted to introduce substantial evidence of this type. Further, not all the evidence was directly relevant to the determination of infringement and would have confused the jury as to the issues which they were to resolve.

■ As to Hickory Springs' attack on the jury instructions, the plaintiff argues that the court "[rewrote] . . . the claim in language broader than the claim itself." The court in its instructions referred to the "one piece side rails" described in the patent and their having a "vertical end plate that can be resiliently flexed in a lateral direction, more easily than the portion of the rail having a right angular cross-section." This, the court stated, results in the clamping of "the box spring by the vertical flanges of the side rails." Hickory Springs maintains that the court's explanation of what claim 4 encompassed failed to give sufficient emphasis to the limitations that *Harris-Hub* found inherent in the claim.

The language the court used does not call one's attention to the element of "parallelism" as strongly as does the description in Harris-Hub. However, we do not find this to be reversible error.

The instructions did mention the contrast called for by the claim between the degree of flexing in the end portions of the rails and the degree of flexing in the major angle iron portions of the rails. The jury could not have been unaware of the significance of this point, for the parties dwelt on it at length during trial. And the jury had a copy of the Fredman reissue patent during its deliberations. Finally, the instructions that Hickory Springs unsuccessfully proffered were not viable alternatives. They provided no clear guidelines and would have been improperly prejudicial to Fredman.

■ We also do not find the court's instruction on equivalence to be reversible error. Hickory Springs asserts, *inter alia*, that the court failed to define adequately what constitutes an "equivalent." However, Hickory Springs suggested no version that was both more explicit and yet not prejudicial.

Plaintiff also urges that the court did not give it an opportunity to present evidence as to the invalidity of claim 4. Although the court did not allow plaintiff to argue this point to the jury, the parties did argue the point to the court itself, both in briefs and orally.

■ In a ruling prior to trial in which the district court had denied plaintiff's motion for summary judgment of invalidity of claim 4, the court had expressed the thought that factual questions "cannot be resolved without trial." 338 F.Supp. at 642. Eventually during the course of the trial, the judge indicated that he was determining the issue of the validity of claim 4 adversely to the plaintiff. It would have been helpful to this court had the district court outlined more specifically than it did the precise reasons for its determination. However, we are satisfied from our review of the record that all of the evidentiary matters Hickory Springs sought to raise on

8. "No error in either the admission or the exclusion of evidence . . . by the court . . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Rule 61, Fed.R.Civ.P.

the issue were before the court and were considered by him, specifically *inter alia* the decision in the Harris-Hub case, the relevant prosecution histories of the reissue patent, and the later concededly non-infringing rails developed by Hickory Springs. We cannot say that the legal issue of validity was incorrectly determined by the court.

## II

On cross-appeal, Harry Fredman contends that, contrary to the district court's conclusions, reissue claims 3, 6, 7 and 8 do not enlarge the scope of the original claims and are valid. Fredman complains that the district court misunderstood 35 U.S.C. § 251, governing the reissuance of "defective patents."[9] See 338 F.Supp. at 639–640. He also maintains that the impact of our *Harris-Hub* decision is limited to the claims then before the court, that is, original claims 3 and 4. The Patent Office, he points out, was aware of *Harris-Hub* and of all prior art, including that mentioned by Judge Stevens in *Harris-Hub*, when it granted Fredman the reissue claims.

We agree with the defendant that section 251 is remedial in intent and should be read liberally. He is correct that under the statute, which prohibits the enlarging of the scope of the claims of the original patent, claims which an applicant seeks to reissue are to be evaluated in light of the scope of the original claims, both valid and invalid. "[The applicant] may correct claims of the original patent that might otherwise be invalid due to their being too broad, by making them narrower or more limited in the reissue patent . . . ." Stewart-Warner Corp. v. A C Sparkplug Co., 5 F.Supp. 371, 377 (E.D.Mich.1933) (decided under a precursor of section 251). See also Edison v. American Mutoscope & Biograph Co., 151 F. 767 (2d Cir. 1907); Sticker Industrial Supply Corp. v. Blaw-Knox Co., 321 F.Supp. 876 (N.D.Ill. 1970). Reissue claim 3 is identical to original claim 3 except for the addition of certain language, which, Fredman asserts, "narrows" the invention originally claimed.[10] Reissue claims 6, 7 and 8 are dependent on reissue claim 3.

---

**9.** Section 251 provides in part:

"Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid . . . by reason of the patentee claiming *more* or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent . . . . No new matter shall be introduced into the application for reissue.

"The Commissioner may issue several reissued patents for distinct and separate parts of the thing patented, upon demand of the applicant . . . .

"*No reissued patent shall be granted enlarging the scope of the claims of the original patent* unless applied for within two years from the grant of the original patent." (Emphasis added.)

It is undisputed that the Fredman reissue patent was applied for more than two years after the issuance of the Fredman original patent. The reissue claims, therefore, cannot "enlarg[e] the scope of the claims of the original patent."

**10.** Reissue claim 3 states:

(3.) A *slatless* bed assembly comprising a pair of side rails, a pair of end boards interconnecting and extending perpendicularly to said rails, a spring assembly supported on and between said rails and between said end boards, each of said rails being of one-piece metallic construction and having a right angular cross-sectional configuration substantially over a major portion of its length and including a horizontal flange extending under the spring assembly *and a vertical flange, and having at each end thereof an end portion which permits the horizontal flanges to be pulled in to underlying relation to the spring assembly, and* a tension member interconnecting the central portions of the rails *for pulling the rails inwardly from their respective at-rest positions so that said vertical flanges contact the spring assembly, notwithstanding variations in the width of the end boards, thereby preventing outward defection of the* central portions of the rails *from their pulled in position with the vertical flanges in contact with the spring assembly* and maintaining the horizontal [flange] *flanges* thereof in underlying relation to the spring assembly *throughout a major portion of the length of said rails* thereby providing support therefor *without the necessity of slats.* The matter enclosed in brackets appeared in the original patent but is not part of the reissue claim; the matter printed in italics indicates the additions made at reissue.

■ Even if we interpret one or two ambiguous passages in the district court's opinion as adopting an unduly restrictive view of section 251, it does not follow that the court's conclusions were therefore erroneous. In invalidating the reissue claims, the court relied heavily on our analysis of the Fredman patent in *Harris-Hub*. Although, as defendant notes, *Harris-Hub* did not deal with reissue claim 3 and the reissue claims dependent thereon, its explanation of the scope of the original claim—regardless of the claim's validity or invalidity—is certainly pertinent to an assessment of the permissible scope of the reissue claims. *Cf.* Edison v. American Mutoscope & Biograph Co., *supra*.[11]

The district court found that "[r]eissue claim 3 lacks any recitation of the limitations of the original claims deemed necessary by the Court of Appeals to patentable invention." 338 F.Supp. at 640. The court was referring primarily to the "unique side rail design" discussed in *Harris-Hub*. Fredman, in his appellate brief, states that he does "not take issue with Judge Morgan's interpretation that reissue claims 3, 6, 7 and 8 do not include any specific recitation directed to Fredman's preferred end plate design . . . ." Defendant argues, however, that this is of no moment; Judge Morgan supposedly failed to grasp the significance of the new limitations included in the reissue claims.

■ The controversy would seem to come down to this: whether the language added in reissue claim 3 narrowed or broadened the original claim. As the district court remarked, reissue claim 3 is "in a sense narrower than original 3 by virtue of the added limitation of a tension means for pulling the rails inwardly . . . ." 338 F.Supp. at 639. However, this "narrowing" is not necessarily sufficient under the law to validate the reissue claims. We find helpful the following comments made in 1954 by P. J. Federico, at the time, Examiner-in-Chief, U.S. Patent Office (Fredman himself brought Federico's essay to our attention.):

"The statute does not define a broadened reissue, or a reissue which enlarges the scope of the claims of the original patent, but the cases indicate that the general rule is that *if a claim of a reissue can hold something as an infringement which would not be an infringement of any of the claims of the original patent* (not considering the validity of such claims), *then the particular claim of the reissue enlarges the scope of the claims of the original patent,* and that a claim is broadened if it is broadened in any respect."

*Commentary on the New Patent Act,* 35 U.S.C.A. pp. 1, 44–45 (1954) (emphasis added).

■ Defendant on appeal maintains that his "basic concept of pulling the side rails inwardly and into contact with the box spring in order to rigidify the bed and bedding, could still be accomplished by angle type side rails, even with conventional end portions." In accordance with this position, Fredman at oral argument asserted that the Harris-Hub rails found by this court not to infringe the original patent would infringe reissue claim 3. We agree that that result would probably follow. But such a result *supports* Judge Morgan's determination that reissue claim 3 improperly enlarges or broadens the scope of the original claims and, hence, is invalid. See Rohm & Haas Co. v. Roberts Chemicals, Inc., 245 F.2d 693, 700 (4th Cir. 1957); Federico, *supra*. The district court did not err in concluding that reissue claims 3, 6, 7 and 8 are invalid.

For the reasons set out hereinbefore, the judgment of the district court is

Affirmed.

11. We find Blonder-Tongue laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), cited by Hickory Springs, to be inapplicable. The Court there held that a prior holding of invalidity of a patent could be raised by an alleged infringer in a subsequent case. See also Bourns, Inc. v. Allen-Bradley Co., 480 F.2d 123 (7th Cir. 1973), cert. denied, 414 U.S. 1094, 94 S.Ct. 726, 38 L.Ed.2d 551.

GRANT, Senior District Judge (dissenting in part).

I respectfully dissent in part.

I dissent from the court's opinion, concluding, as I do, that this court should have reversed the jury's finding that the accused Hickory Springs device was infringing the Fredman patent. In contrast to a statement in the court's opinion, this may well be one of those "rare cases in which the appellate court may consider infringement directly", because the court's construction of the patent is the main determinant factor on the issue of infringement. Sterner Lighting, Inc. v. Allied Electrical Supply, Inc., 431 F.2d 539, 543 (5th Cir. 1970). However, the standard to be applied in reviewing the case before us is not crucial inasmuch as the finding of the jury, in my considered judgment, was "clearly erroneous".

This court previously reviewed Fredman's patent for a "slatless bed" frame and found the 4th claim of the patent (which claim was later re-issued but left essentially unchanged) to be valid. Fredman v. Harris-Hub Company, 442 F.2d 210 (7th Cir. 1971). The device described in the patent is a bed rail assembly which can be attached to a headboard and a footboard to hold a box springs and mattress. Originally, slat-type bed assemblies contained wooden side rails which were inserted into the headboard and footboard, with the wooden slats placed on the rails to support the springs and mattress. Slatless beds were much desired in order to eliminate the cumbersome wooden slats which would often fall down when the bed was moved or jostled. Due to the fact that headboards and footboards were often designed so as to place the rails a greater distance apart than the width of the box springs, the rails had to be made to conform to the width of the springs. The Fredman patent contained a unique rail assembly which envisioned as one piece a wide rail and a deflected end plate which would fit into the headboard and footboard. The court upheld the validity of that patent (under patent claim 4) because it disclosed a device which

securely held the springs throughout the length of the bed by clamping them alongside essentially parallel rails and supporting them with a wide horizontal lip on the bottom of the rails. The court found that that patent did not cover the accused Harris-Hub device which had conventional narrow rails being pulled at the center by a tension member (a strap) to hug the springs at that point. Not only did such a device lack the required parallelism, but it supported the springs by clamping them at the center rather than resting them on a wide horizontal lip at the bottom of the rail. Of course, the patented assembly prevented the wide headboards and footboards from pulling the rails away from the springs, but the court denied the claim (patent claim 3) that this was an "anti-spread" device and that it would cover conventional rail systems which had the rails *pulled in* (bowing) at the center to avoid spreading. *What Fredman had patented was a unique method of securely supporting the springs throughout the length of the bed.*

In my judgment, the accused device is not infringing the patent as described in *Harris-Hub.* The accused device merely involves the attachment of a deflected end plate to a conventional rail with a couple of bolts. Certainly, claim 4 of the patent as construed by the court cannot prohibit all use of the cut off end plate. The court noted the pains to which the inventor had gone to create the sophisticated rail design for his assembly and found that his rail design was a crucial feature of the patented invention. *Harris-Hub,* supra, 442 F.2d at 215. Without utilizing the strengthening effect of the merger of the end plate and rail, the desired parallelism of the patented device simply will not exist. And without utilizing the widened horizontal lip on the rails, the springs will be held by clamping the springs at the center of the bed and by the tension member which joins the bowing rails. The secure uniform fit which this court found so beneficial in *Harris-Hub* will not be achieved. These observations were borne out in the demonstration of the accused device

which took place at oral argument on appeal. I find it inconsistent with the court's previous interpretation of the patent to say that the accused device infringes. It is for that reason that I am of the opinion that the infringement question can and should be reviewed under the standard suggested in *Sterner Lighting, supra.* Moreover, even if this court treats the issue as we would any other review of fact finding, a review of all of the evidence and comparison of the patent and the design of the accused device make it convincing to me that the finding of the jury was clearly erroneous. Accordingly, I would hold that the finding of infringement in this action should be reversed.