**HICKORY SPRINGS MANUFACTUR-
ING COMPANY, Plaintiff,**

v.

**FREDMAN BROTHERS FURNITURE
COMPANY, Inc. and Harry
Fredman, Defendants.**

No. P–3170.

United States District Court,
S. D. Illinois, N. D.

Feb. 18, 1972.

Tim W. Swain, II, Peoria, Ill., Dalbert U. Shefte, Charlotte, N. C., for plaintiff.

Harvey B. Jacobson, Jr., Washington, D. C., Lyle W. Allen, Peoria, Ill., for defendants.

## OPINION AND ORDERS

ROBERT D. MORGAN, District Judge.

By its complaint herein, plaintiff sought a declaratory judgment that Fredman Patent No. 3,118,151 was invalid, or, if valid, that it was not infringed by plaintiff's accused product. Subsequent to the filing of the complaint, the Court of Appeals for the Seventh Circuit affirmed a judgment in another cause finding claim 3 of that patent invalid and finding claim 4 thereof valid, but not infringed by the accused products there involved. Fredman v. Harris-Hub Company, Inc., 442 F.2d 210 (7 Cir. 1971). On August 24, 1971, 330 F.Supp. 978, this court held claim 3 of such patent to be invalid, but denied plaintiff's motion to the extent that it sought summary judgment that claim 4 of the patent was not infringed by plaintiff's accused product.

Meanwhile, on June 7, 1971, defendant, Harry Fredman, had filed an application for reissue of his patent. That application was allowed and Reissue Patent No. 27,182 was issued to Fredman on September 21, 1971. The pleadings were then amended to substitute Reissue No. 27,182 for the original patent as the patent in suit.

The cause is now before the court upon plaintiff's motion for a summary judgment to declare reissue claims 3, 4, 6, 7 and 8 and original claim 4 invalid.

### CLAIMS 3, 6, 7 & 8

Insofar as reissue claim 3 is concerned, plaintiff asserts the contention that that claim, if held valid, would enlarge the scope of the claims of the original patent in violation of the provisions of 35 U.S.C. § 251. Since reissue claims 6, 7 and 8 are dependent on reissue claim 3, plaintiff argues that those claims must fall automatically if reissue claim 3 is held to be invalid.

Section 251 provides, in pertinent part: " * * * No reissued patent shall be granted enlarging the scope of the original patent unless applied for within two years from the grant of the original patent." 35 U.S.C. § 251.[1]

Decision of the issue presented as to reissue claim 3 requires a comparison of the scope of that claim with the scope of the claims of the original patent.

Defendant argues that original claim 3, having been adjudged invalid, has no scope, and that the comparison of reissue 3 must be limited to the scope of other original claims, except original 3. That argument must be rejected. Original 3 is a nullity and it has no scope in the context of any contention that it might be infringed. However, it must be considered in the context of any determination whether reissue claims enlarge the scope of the claims of the original patent which they supersede. The determination question is whether a contested reissue claim is broader in scope than the apparent scope of the totality of the claims allowed in the original patent.

The patent relates to a bed assembly, comprised of conventional end boards, a conventional spring assembly, and a pair of one-piece metallic side rails with a tension means interconnecting the side rails at the center thereof, designed to support the spring assembly firmly without the use of cross slats and to rigidify the total bed combination.

In general, the invention was designed to avoid the problems inherent in the use of slats, with conventional side rails, to support the spring assembly of beds. The greatest problem in the use of slats was the tendency of the slats to fall under the stress of the downward flexion of the slats themselves and outward flexion of the side rails. Also, the invention was designed to cope with the fact that, though spring assemblies are of a standardized width, i. e., 52½ inches for double beds, the width between the notches on each end board, in which the ends of

---

1. The original patent was issued January 21, 1964, more than seven years prior to the date of Fredman's reissue application.

the side rails are supported, may vary to as much as 54½ inches apart.

In the context of those problems recited in the patent specifications, the Court of Appeals in *Harris-Hub* defined the inventive novelty of defendants' patent. Thus, the court said:

"Plaintiff discovered an ingenious and by no means obvious solution to the problem. He designed new side rails which differed from the conventional in several respects. They contained a broader horizontal ledge which provides firm support for the spring assembly. More significantly, they were designed to provide a snug clamping relationship between the vertical portions of the two side rails and the spring assembly, with the side rails retaining their parallelism with each other and their firm support for the spring assembly, notwithstanding variations in the distance between headboard notches.

"The patented rail has both a horizontal and a vertical flange over the major portion of its length, but near its ends the horizontal flange flows downwardly into the plane of the vertical flange. In consequence, when the rails are affixed to the headboards and footboards, and interconnected by a centrally located tension member, deflection may occur at the ends of the rails while the major portions of the rails maintain their parallel relationship with each other. * * *

" * * * The [Harris-Hub] device does nothing more than interconnect the centers of two conventional metal siderails with a strap that applies sufficient tension to bow the rails inwardly against the bedding." 442 F. 2d at 213.

In affirming the District Court's decision that original claim 3 was anticipated by the prior art and, thus, invalid, the court said:

" * * * We, therefore, construe claim 3 as an anti-spread device contemplating a slatless assembly for beds with end board notch separations equal to the width of the springs. As such, it was plainly invalid.

"Apart from the question of anticipation, we would have grave doubt about the validity of plaintiff's patent if his idea embodies nothing more than a tension member connecting two ordinary metal side rails." (Citations omitted.) 442 F.2d at 215.

In discussing the trial court's finding that claim 4 was not infringed, the court defined what the invention is not in the following language:

"The text of the patent indicates that one of the inventor's assumptions, which required him to design a novel rail with its horizontal flange flaring into the vertical at its ends, was that the 'right angular cross-sectional configuration will not flex.' If flexing a conventional rail into a bow had been within his conception, and if that configuration produced a result which is truly an equivalent of his invention, he took unnecessary pains to develop his sophisticated rail design. We think a fair reading of the entire patent indicates that his contribution to the art was predicated on an assumption that the portion of the rail which provides both clamping pressure from the vertical flange and adequate support from the horizontal flange 'will not flex.'

"We are also persuaded that plaintiff cannot deny that the true parallelism of his device produces a result sufficiently superior to the bowing of conventional rails to preclude application of the doctrine of equivalence. The benefits of parallelism are described in the specifications and, in large part, constitute the objective achieved by the special design of the rails. As we consider the rail design a crucial feature of plaintiff's patented invention, we are unwilling to extend the scope of plaintiff's monopoly to include all slatless bed assemblies using a tension member to interconnect conventional side rails. Plaintiff has no patent on the function performed by his inven-

tion. The substance of plaintiff's invention includes an original design for side rails.

"We read the language which plaintiff used in his patent as foreclosing his claim that tension sufficiently strong to bow conventional rails is the equivalent of his unique side rail design. He may not thus demean his own ingenious concept." (Footnotes omitted.) 442 F.2d at 215–216.

The quoted language from *Harris-Hub* can only be read as holding that the essential element of invention was the unique design of defendant's side rail, as described in claims 1 and 4 of the original patent, which enabled deflection of the rail ends while, in conjunction with the tension member between the rails, the major portion of the rails maintained a constant, spaced, parallel relationship each to the other. Original claim 3 was invalid because it failed to include the limitation of that unique rail design, and read on any concept of the use of a tension device to avoid outward flexion of, or to deflect inward, any rail, including conventional rails.

When reissue claim 3 is compared to the original patent claims, as there interpreted, the conclusion is inescapable that reissue 3 is invalid.

Reissue 3 (with italicized material added to, and bracketed material deleted from, the text of original claim 3) reads:

"3. A *slatless* bed assembly comprising a pair of side rails, a pair of end boards interconnecting and extending perpendicularly to said rails, a spring assembly supported on and between said rails and between said end boards, each of said rails being of one-piece metallic construction and having a right angular cross-sectional configuration substantially over a major portion of its length and including a horizontal flange extending under the spring assembly *and a vertical flange, and having at each end thereof an end portion which permits the horizontal flanges to be pulled in to underlying relation to the spring assembly, and* a tension member interconnecting the central portions of the rails *for pulling the rails inwardly from their respective at-rest positions so that said vertical flanges contact the spring assembly, notwithstanding variations in the width of the end boards,* thereby preventing outward deflection of the central portions of the rails *from their pulled in position with the vertical flanges in contact with the spring assembly* and maintaining the horizontal [flange] *flanges* thereof in underlying relation to the spring assembly *throughout a major portion of the length of said rails* thereby providing support therefor *without the necessity of slats.*"

While in a sense narrower than original 3 by virtue of the added limitation of a tension means for pulling the rails inwardly, reissue 3 is yet subject to the same deficiency which rendered original 3 invalid. It relates to side rails, generically without any limitation. It would cover conventional rails, defendant's rail, or any other metallic rail having a right-angular cross-sectional configuration. The defect is not cured by the language that the rails have "at each end thereof an end portion which permits the horizontal flanges to be pulled in to underlying relation to the spring assembly." That language reads on the *Harris-Hub* design, as well as any other rail subjected to sufficient force to cause the inward flexion of a part of the rail against the spring assembly. The *Harris-Hub* rail had end portions and a tension cross member which permitted "the horizontal flange to be pulled in to an underlying relation to the spring assembly" over a part of the extent of the rail.

Moreover, the "pulling-in" concept is contra to the inventive concept as described in the specifications of the patent. The specifications describe a rail design, having a right-angular cross-sectional configuration, with a horizontal flange and a vertical flange extending over a substantial portion of the length thereof, with the horizontal flange flow-

ing downwardly at each end into the vertical flange to create an end plate which is laterally flexible, and a cross member extending between the centers of the two rails to maintain them in substantially parallel relationship each to the other when the ends of the rails are deflected to engage the notches in the end boards, all based upon the premise that the right-angular portion of the rails would not flex.

Reissue claim 3 lacks any recitation of the limitations of the original claims deemed necessary by the Court of Appeals to patentable invention. Without such limitations the claim could be infringed by devices which would not infringe the valid claims of the original patent. Reissue 3 is, therefore, broader than the original claims and invalid. Rohm & Haas Co. v. Roberts Chemicals, Inc., 245 F.2d 693, 699–700 (4 Cir. 1957); Schenk v. United Aircraft Corp., 43 F.Supp. 679, 685 (D.Conn.1941), modified sub nom, Picard v. United Aircraft Corporation, 128 F.2d 632 (2 Cir. 1942), cert. denied, 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524 (1942).

Plaintiff's position with reference to its claim of the invalidity of reissue claims 6, 7 and 8 is well taken. Though each of those claims does contain limitations not contained in reissue 3 upon which each is dependent, each is still broader than the scope of the original claims as defined in *Harris-Hub*.

The reference to "vertical rail plates," contained in claims 6 and 8, which permit the pulling in of the central portion of the rails, cannot be construed as a limitation in comport with the inventive concept as defined in *Harris-Hub*. Those claims are generic and beyond the scope of Fredman's unique rail design which the Court of Appeals has held to be an essential element of patentable invention.

Each of these claims also exceeds in scope the concept of invention described in the patent specifications. The specifications describe a combination bed assembly comprised of two end boards, a spring assembly, two side rails, and a tension means extended between the centers of the side rails, with the rail design being such that the ends of each rail are resilient and can be laterally deflected, while substantially the whole extent of the length of such rail would remain rigidly in contact with the spring assembly despite the lateral deflection of the ends. A superior result is described as achieved by the unique rail design which permits the relatively non-flexible right-angular portions of the rails to be maintained in constant parallel relationship to each other and immediately adjacent the sides of the spring assembly, though the rail ends be deflected an inch or more beyond the vertical plane of the spring assembly. None of the claims involved is limited to that concept.

Like reissue claim 3, each of the dependent claims can be read as covering any rail which could, through the application of sufficient tension, be bowed and drawn in against the spring assembly. Reissue claims 6, 7 and 8 are therefore broader in scope than the original patent claims and invalid.

### CLAIM 4

Plaintiff contends that both original claim 4 and reissue claim 4 overclaim the invention and are, therefore, invalid. That contention rests upon amendments to the specifications in the reissue patent pursuant to a sworn declaration submitted to the Patent Office by Mr. Fredman in support of his reissue application. In his declaration, Mr. Fredman stated that he had inadvertently overclaimed his invention in original claim 3 because that claim was not explicitly limited to a bed structure in which the central tension member "pulled the side rails inwardly," and that he had believed that original claim 3 was so limited.

The original specifications had stated that end board members were not standardized and that the distance between the notches designed to engage and support the rail ends may be spaced apart a greater, or lesser, distance than the

width of the spring assembly.[2] The reissue specifications were amended by deleting each reference to a "lesser" distance, thus restricting specification references to the concept that flexion of the end portions of the rails would always be outward from the vertical plane of the spring assembly.

Reissue claim 4 was unchanged in literal substance from the language of original claim 4. In pertinent part, each recites the feature of an end portion of each rail "formed in the configuration of a vertical plate capable of being resiliently laterally deflected" to enable the end portions to be "deflected laterally to engage with pins on the end boards spaced at varying distances apart."[3]

Plaintiff argues that the language of both original claim 4 and reissue claim 4 is generic, equally applicable to either inward or outward flexion of the rail ends, while the specifications, conforming to the claimant's declaration, are specifically limited to the outward flexion of the rail ends. It thus asserts that claim 4 overclaims the invention which Mr. Fredman has sworn that he invented.

Defendants' response to plaintiff's motion is supported by the affidavit of a patent expert, who states, based upon his studying of the original and reissue patents and the prior opinions of courts in the Seventh Circuit interpreting the patent claims, that claim 4 described a bed combination in which the end portions of rails deflect only in manner such that the side rails are pulled inwardly to clamp the spring assembly therebetween. A supporting affidavit of a son of Mr. Fredman, based upon a stated experience of twenty years in the manufacture and retailing of furniture, states that the slots in the end boards for double beds are spaced, at least, 53 inches apart, with the distance therebetween ranging upward to a maximum of 54½ inches.

Plaintiff's position as to claim 4 must be rejected. The Court of Appeals' opinion in *Harris-Hub* suggests that the claim must be interpreted as relating only to outward flexion of the rail ends. In that appeal, Mr. Fredman argued that original claim 3, in its reference to "maintaining" a spaced relationship between rails, should be interpreted to also describe an inward deflection of the rail centers into the spring assembly. In rejecting that argument, the Court said that the argument "relates to the favorable pulling action of the actual device described in claim 4," not to the concept of avoidance of spreading implied

---

2. Such references appeared in the specifications at column 2, lines 39 and 61, column 3, line 36, and column 4, line 30.

3. Reissue claim 4, the italicized portion replacing the bracketed material deleted from the original claim, reads:
   "*A bed assembly comprising a pair of side rails, a pair of end boards interconnecting and extending perpendicularly to said rails, a spring assembly supported on and between said rails and between said end boards, each of said rails being of one-piece metallic construction and having a right angular cross-sectional configuration substantially over a major portion of its length and including a horizontal flange extending under the spring assembly, a tension member interconnecting the central portions of the rails thereby preventing outward deflection of the central portion of the rails and maintaining the horizontal flange thereof in under-*derlying relation to the spring assembly, thereby providing support therefor.* [The structure as defined in claim 3] wherein each end portion of each rail is formed in the configuration of a vertical plate capable of being resiliently laterally deflected, hook members on the ends of each rail for engagement with the end boards, said plates enabling the end portions of the rails to be deflected laterally to engage with pins on the end boards spaced at varying distances apart for connecting the rails to the end boards while maintaining the central portions thereof in constant spacial relation, the spacial relation between the vertical flanges of the said rails being such that the spring assembly will be clamped therebetween whereby the spring assembly is locked to the rails to rigidify the entire assembly by retaining the vertical flanges snugly to the spring assembly throughout the major portion of the length of the rails."

**642**

by the use of the word "maintaining" in original claim 3. Fredman v. Harris-Hub Company, *supra* 442 F.2d at 214.[4] The language of the court is certainly indicative that the court did interpret claim 4 as limited to outward deflection of the rail ends, though the question of proper interpretation may not be thereby completely resolved.

■ A patent claim must be interpreted in the light of the knowledge of those of ordinary skill in the art. American Infra-Red Radiant Co. v. Lambert Industries, Inc., 238 F.Supp. 176, 183 (D.Minn.1965), modified on other grounds, 360 F.2d 977 (8 Cir. 1966), cert. denied, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966); Application of Corr, 347 F.2d 578, 580, 52 CCPA 1505 (1965).

In Lambert, the court said, in part:

"Descriptions in claims for a patent * * * are not addressed to the public generally, or to lawyers, or judges, but to those skilled in the art to which the invention pertains * * * and hence sufficiency of such claims must be tested in light of such claimed facts and be judged by what it conveys to those skilled in the art." American Infra-Red Radiant Co. v. Lambert Industries, Inc., *supra*, 238 F.Supp. at 183.

■ The question of interpretation depends upon evidence related to knowledge and understanding in the art involved. Factual questions thus are involved, which cannot be resolved without trial.

Accordingly, it is ordered that judgment be, and same is hereby, entered that claims 3, 6, 7 and 8 of Reissue Patent 27,182 are each invalid.

4. Original claim 3 reads:
  "A bed assembly comprising a pair of side rails, a pair of end boards interconnecting and extending perpendicularly to said rails, a spring assembly supported on and between said rails and between said end boards, each of said rails being of one-piece metallic construction and having a right angular cross-sectional configuration substantially over a major por-

It is further ordered that plaintiff's motion for summary judgment of the invalidity of claim 4 of Patent 3,118,-151 and claim 4 of Reissue Patent 27,-182 is hereby denied.

The court is of the opinion that either or both of the foregoing judgment orders involve one or more controlling questions of law as to which there may be substantial ground for difference of opinion, that an immediate appeal therefrom might materially advance the ultimate termination of litigation in this cause, and that proceedings in this court should be stayed pending determination of any appeal allowed under Section 1292(b), Title 28, United States Code.

It is so ordered.

tion of its length and including a horizontal flange extending under the spring assembly, a tension member interconnecting the central portions of the rails, thereby preventing outward deflection of the central portions of the rails and maintaining the horizontal flange thereof in underlying relation to the spring assembly thereby providing support therefor."